UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON
*Electronically Filed*

| | |
|---|---|
| LUCY HATMAKER, as Administratrix of the Estate of Billye Jo Bryant, TRISTAN WINSTEAD, and WAYNE DOWNS, as Guardian and Natural Parent of E.D. ) ) ) ) ) ) | |
| Plaintiffs ) | Case No. 6:21-cv-94-CHB-HAI |
| ) | |
| v. ) ) | |
| ROCKCASTLE COUNTY, KENTUCKY ) ) ) | |
| Serve: Howell Holbrook ) County Judge/Executive ) 205 E Main Street ) Mt. Vernon, Kentucky 40456 ) ) | |
| NATHAN CARTER ) ) | |
| Serve: Rockcastle Co. Detention Center ) 205 E Main Street ) Mt. Vernon, Kentucky 40456 ) ) | |
| BRAD JOHNSON ) ) | |
| Serve: Rockcastle Co. Detention Center ) 205 E Main Street ) Mt. Vernon, Kentucky 40456 ) ) | |
| JOSIE ADAMS ) ) | |
| Serve: Rockcastle Co. Detention Center ) 205 E Main Street ) Mt. Vernon, Kentucky 40456 ) ) ) ) ) ) | |

| | |
|---|---|
| JANA ROBINSON | ) |
| Serve: Rockcastle Co. Detention Center | ) |
|     205 E Main Street | ) |
|     Mt. Vernon, Kentucky 40456 | ) |
| | ) |
| CATHY GREGG | ) |
| | ) |
| Serve: Rockcastle Co. Detention Center | ) |
|     205 E Main Street | ) |
|     Mt. Vernon, Kentucky 40456 | ) |
| | ) |
| SUZANNE SMITH | ) |
| | ) |
| Serve: Rockcastle Co. Detention Center | ) |
|     205 E Main Street | ) |
|     Mt. Vernon, Kentucky 40456 | ) |
| | ) |
| ADVANCED CORRECTIONAL HEALTHCARE | ) |
| | ) |
| Serve: CT Corporation System | ) |
|     306 W Main Street, Suite 512 | ) |
|     Frankfort, Kentucky 40601 | ) |
| | ) |
| ROCKCASTLE COUNTY DETENTION CENTER MEDICAL DIRECTOR | ) |
| | ) |
| Serve: Rockcastle Co. Detention Center | ) |
|     205 E Main Street | ) |
|     Mt. Vernon, Kentucky 40456 | ) |
| | ) |
| TIM POYNTER | ) |
| | ) |
| Serve: Rockcastle Co. Detention Center | ) |
|     205 E Main Street | ) |
|     Mt. Vernon, Kentucky 40456 | ) |
| | ) |
| AMY (LAST NAME UNKNOWN) | ) |
| | ) |
| Serve: Rockcastle Co. Detention Center | ) |
|     205 E Main Street | ) |
|     Mt. Vernon, Kentucky 40456 | ) |
| | ) |

```
ASHLEY (LAST NAME UNKNOWN)        )
                                  )
Serve: Rockcastle Co. Detention Center  )
       205 E Main Street          )
       Mt. Vernon, Kentucky 40456  )
                                  )
ELISHA (LAST NAME UNKNOWN)        )
                                  )
Serve: Rockcastle Co. Detention Center  )
       205 E Main Street          )
       Mt. Vernon, Kentucky 40456  )
                                  )
           Defendants             )
```

**\*\*\*\*\*\*\*\*\*\*\***

## COMPLAINT

### Introduction

1. Billye Jo Bryant was incarcerated at Rockcastle County Detention Center ("the Jail") when she began exhibiting obvious symptoms of a serious illness. After she was initially diagnosed with flu, Bryant's condition worsened severely. Though she and her cellmates begged the Jail's employees and medical staff for assistance, no one even took her vital signs for nearly six hours. After her condition continued to worsen and her skin turned gray, Jail staff finally took her to the hospital. However, after that crucial delay, Bryant died of septic shock. Plaintiffs seek damages caused by Defendants' conduct pursuant to the Fourteenth Amendment to the United States Constitution, the Civil Rights Act of 1871, and Kentucky common law.

3

## Parties and Jurisdiction

2. Lucy Hatmaker is a resident of Rockcastle County, Kentucky. As Billye Jo Bryant's mother, the Rockcastle District Court appointed Hatmaker Administrator of Bryant's Estate on March 3, 2021. The court's order is attached as Exhibit A.

3. Tristan Winstead is a resident of Rockcastle County, Kentucky. He was Bryant's minor child when Bryant died.

4. Wayne Downs is a resident of Madison County, Kentucky. He is the guardian and natural parent of E.D., who was Bryant's minor child when Bryant died.

5. At all times relevant to this Complaint, Defendant Rockcastle County, Kentucky was responsible for the establishment of policies and procedures, either formally or by custom, regarding the employment, training, supervision, discipline, and conduct of all officers, employees, and independent contractors at the Jail, and was responsible for the employment, training, supervision, discipline, and conduct of all officers, employees, and independent contractors at the Jail.

6. At all times relevant to this Complaint, Defendant Nathan Carter was the Rockcastle County Jailer. He was responsible for the establishment of policies and procedures, either formally or by custom, regarding the employment, training, supervision, discipline, and conduct of all employees and independent contractors at the Jail, and was responsible for the employment, training, supervision, discipline, and conduct of all employees and independent contractors at the Jail. He was

further responsible for the health and welfare of all people incarcerated at the Jail. He is sued in his individual capacity.

7. At all times relevant to this Complaint, Defendant Brad Johnson was a Lieutenant at the Jail. He was responsible for the establishment of policies and procedures, either formally or by custom, regarding the employment, training, supervision, discipline, and conduct of all employees and independent contractors at the Jail, and was responsible for the employment, training, supervision, discipline, and conduct of all employees and independent contractors at the Jail. He was further responsible for the health and welfare of all people incarcerated at the Jail, and personally and directly participated in Bryant's mistreatment. He is sued in his individual capacity.

8. At all times relevant to this Complaint, Defendants Josie Adams, Jana Robinson, Cathy Gregg, and Suzanne Smith were deputy jailers at the Jail. They were responsible for the health and welfare of all people incarcerated at the Jail, and personally and directly participated in Bryant's mistreatment. They are sued in their individual capacities.

9. At all times relevant to this Complaint, Advanced Correctional Healthcare, Inc. was an Illinois corporation licensed to do business in Kentucky. ACH contracted with the Jail to provide medical treatment to people incarcerated there. Pursuant to that contract, ACH was responsible for hiring competent medical providers, implementing and enforcing appropriate policies, procedures, protocols, customs, and practices for the care of Jail inmates, and training, supervising, and

5

disciplining those medical providers to ensure their competence. ACH was ultimately responsible for the medical treatment provided by its employees or agents. ACH was responsible for assigning employees, agents, or independent contractors to review medical records or otherwise maintain its employees, agents, or independent contractors' awareness of the medical condition of all people incarcerated at the Jail.

10. At all times relevant to this Complaint, Rockcastle County Detention Center Medical Director (Jail Medical Director) was the medical director at the Jail. He/she was responsible for the health and welfare of all people incarcerated at the Jail, addressing the serious medical needs of all people incarcerated at the Jail, implementing and enforcing appropriate policies, procedures, protocols, customs, and practices for the care of the Jail's inmates, and the training and supervision of all other medical staff at the Jail. He/she was responsible for reviewing medical records or otherwise maintaining his/her awareness of the medical condition of all people incarcerated at the Jail, and personally and directly participated in Bryant's mistreatment. Plaintiffs are unaware of his/her name but this Complaint and Defendants' prior knowledge provides sufficient information for Defendants to identify the Medical Director and provide them notice of this Complaint.

11. At all times relevant to this Complaint, Defendant Tim Poynter was an APRN at the Jail. He was responsible for the health and welfare of all people incarcerated at the Jail, and addressing the serious medical needs of all people incarcerated at the Jail. He was responsible for reviewing medical records,

providing training and instructions for monitoring sick inmates, and otherwise maintaining his awareness of the medical condition of all people incarcerated at the Jail. He was also responsible for the training and supervision of all other medical staff at the Jail. He personally and directly participated in Bryant's mistreatment.

12. At all times relevant to this Complaint, Defendant Amy (Last Name Unknown), Ashley (Last Name Unknown), and Elisha (Last Name Unknown) were nurses at the Jail. They were responsible for the health and welfare of all people incarcerated at the Jail, and addressing the serious medical needs of all people incarcerated at the Jail. They were responsible for reviewing medical records or otherwise maintaining her awareness of the medical condition of all people incarcerated at the Jail, and personally and directly participated in Bryant's mistreatment. They are sued in their individual capacities.

13. Defendants ACH, Jail Medical Director, Poynter, Amy, Ashley, and Elisha are referred to as "Medical Defendants."

14. This Court has subject matter jurisdiction over this action and venue is proper. Plaintiff's claims involve an amount more than the jurisdictional limit of this Court and a substantial amount of the conduct giving rise to this matter occurred in this judicial District.

**Facts**

15. On or about March 6, 2020, Bryant was incarcerated in the Jail.

16. On or about March 6, 2020 and March 7, 2020, Bryant was having difficulty breathing, she had a fever and was unable to eat due to nausea. The

7

seriousness of Bryant's condition was obvious to laypersons. Bryant and the women incarcerated in the cell with her knew she needed medical attention.

17. Bryant and her cellmates spoke with Defendants Johnson, Adams, Robinson, Smith, Greg, Amy, Ashley, and Elisha, and advised them of Bryant's obvious symptoms. Further, each of those defendants observed Bryant's obviously serious symptoms. Despite that, none provided Bryant treatment or ensured that someone else provided her treatment.

18. When Adams finally checked Bryant's vital signs, her blood pressure, temperature, and pulse were all elevated. Adams called Poynter and advised him of Bryant's symptoms. Poynter prescribed ibuprofen for fever and Zofran for nausea, and advised Adams to continue to monitor Bryant and call him back if her 140 pulse rose over 150. Adams told Johnson about Bryant's symptoms and her conversation with Poynter.

19. When Adams rechecked Bryant's heart rate, it was still elevated but below 150. She did not check any other of Bryant's vital signs nor did she call Poynter despite Bryant's elevated heart rate.

20. Alternatively, she called Poynter regarding Bryant's elevated heart rate but he again told Adams to call him back if Bryant's heart rate rose above 150.

21. At approximately 9:00 a.m. on March 8, 2020, Johnson and Gregg checked Bryant. She still had chills, cough, pain, and a headache. Her blood pressure and temperature were elevated. Her heart rate was 153. Finally, when Poynter was notified, he advised Johnson to send Bryant to the emergency room.

8

22. At Johnson's behest, Robinson took Bryant to the Rockcastle Regional Emergency Room. Bryant complained of shortness of breath, fever, chills, sweating, heart racing, and cough, and that her symptoms began two days prior. Evaluation by hospital personnel discovered rhonchi, or wheezing, and decreased air movement in the lungs. Bryant tested positive for flu. A doctor prescribed her Tamiflu and Levaquin, and released her back to jail.

23. Despite Johnson's, Adams', Robinson's, Gregg's, Smith's, and Poynter's knowledge that a doctor prescribed Bryant Levaquin, none filled that prescription or ensured that she received Levaquin.

24. Between her return to the Jail at 11:06 a.m. and approximately 5:00 p.m., Bryant's situation continued to worsen. She was lying on her back in her cell, having difficulty breathing, sweating heavily, and continually vomiting. She developed chest pain. As breathing became harder for her, her skin ultimately turned gray. Bryant and her cellmates spoke with Johnson, Adams, Robinson, Smith, Greg, Amy, Ashley, and Elisha, and advised them of Bryant's obviously serious symptoms. Further, each of those defendants observed Bryant's obviously serious symptoms. Despite that, none provided Bryant treatment or ensured that someone else provided her treatment.

25. That the other inmates noticed Bryant's condition demonstrates that her serious medical condition was obvious even to laypersons. Further, Bryant's need for medical care would have been obvious to a layperson.

26. Finally, nearly six hours after Bryant returned from the hospital, Johnson, Robinson, and Gregg checked her vital signs. She still had an elevated temperature, her oxygen saturation had plummeted, and her pulse was 173. Johnson called Poynter who told him to send Bryant to the ER immediately.

27. Bryant immediately required a breathing treatment. Diagnostic testing revealed that Bryant had sepsis and pneumonia. A doctor admitted her for inpatient treatment. At approximately 5:00 a.m., hospital staff discovered pulmonary edema. Bryant was then transported by air to University of Kentucky Medical Center, where she died. A UKMC physician determined Bryant's death to be the result of septic shock secondary to strep pneumonia secondary to flu.

28. On information and belief, the Jail had an emergency medical services policy. That policy identified Bryant's condition as an emergency and required any person who observed an inmate in that condition to ensure the inmate received immediate medical attention.

29. Despite that policy, and despite the fact that they knew inmates would commonly have medical emergencies in the Jail, neither Rockcastle County, Carter, Johnson, ACH, Jail Medical Director, or Poynter ("Training/Supervising Defendants") trained their subordinates to identify or respond appropriately to medical emergencies.

30. Further, after previous situations in which Jail employees and contractors did not act appropriately under the Jail's emergency medical services

policy, no Training/Supervising Defendant punished any employee or contractor for that failure or provided additional training to correct that behavior.

      31.     The individual defendants' misconduct reflected and was a consequence of their lack of training and/or supervision.

      32.     Training/Supervising Defendants knew how their subordinates reacted in situations involving serious medical conditions and intentionally chose not to intervene, to enforce the applicable policies with appropriate discipline, or to otherwise provide corrective training and supervision.

      33.     Through their actions and inactions, Training/Supervising Defendants, acquiesced in, endorsed, and ratified their subordinates' failure to treat obviously serious medical conditions.

      34.     The failure and refusal of Training/Supervising Defendants and their subordinates to identify and treat obviously serious medical conditions among the inmate population was so common and widespread as to amount to a practice, and therefore an unwritten policy, of the Jail.

      35.     Because of Defendants' conduct described above, Defendants severely injured Bryant, for which Plaintiffs are entitled to recover actual damages in an amount to be determined at trial.

### Count 1:
### Objective Unreasonableness/Deliberate Indifference
### 42 U.S.C. § 1983
### (All Individual Defendants)

      36.     Defendants acted under color of law.

37. Bryant had a serious medical need in that she had a condition that a licensed medical provider determined required treatment or a condition so obvious that even someone who is not a licensed medical provider would recognize required treatment.

38. Defendants knew that Bryant had a serious medical need or strongly suspected facts showing a strong likelihood that Bryant had a serious medical need but refused to confirm whether these facts were true.

39. Defendants consciously failed to take reasonable measures to provide or obtain treatment for Bryant's serious medical need.

40. Defendants' actions were objectively unreasonable if not deliberately indifferent.

41. Because of Defendants' actions, Bryant was harmed, subjected to a significant risk of harm, or both.

42. In addition to compensatory damages, interest, expenses, and court costs, the Estate is entitled to punitive damages and an award of attorney fees in prosecuting this action, pursuant to 42 U.S.C. § 1988.

### Count 2:
### *Monell Liability*
### 42 U.S.C. § 1983
### (Training/Supervising Defendants)

43. Training/Supervising Defendants' respective training programs were inadequate to train their employees and independent contractors to carry out their duties.

44. Training/Supervising Defendants failed to adequately train, supervise, or discipline their employees.

45. Training/Supervising Defendants' respective failures to adequately train, supervise, or discipline their employees or independent contractors was objectively unreasonable, or amounted to deliberate indifference to the fact that inaction would obviously result in the violation of the right to treatment for a serious medical need.

46. Training/Supervising Defendants' respective failures to adequately train, supervise, or discipline their employees or independent contractors proximately caused the violation of Bryant's right to treatment for a serious medical need.

47. In addition to compensatory damages, interest, expenses, and court costs, the Estate is entitled to punitive damages and an award of attorney fees in prosecuting this action, pursuant to 42 U.S.C. § 1988.

### Count 3:
### Negligence/Gross Negligence
### (All Individual Defendants)

48. It was Defendants' duty to exercise ordinary care for the safety of other persons, including Bryant, to avoid foreseeable injuries.

49. Defendants knew or should have known Bryant was at risk of injury.

50. Defendants' breach of their duty was a substantial factor in causing Bryant's injuries and death.

51. Medical Defendants' treatment fell below the standard of care.

52. Medical Defendants' breach of the standard of care was a substantial factor in causing Bryant' injuries.

53. Defendants' wanton, reckless, malicious, or oppressive conduct manifested an extreme indifference to the lives and safety of others, including Bryant.

54. In addition to compensatory damages, interest, expenses, and court costs, Bryant is entitled to punitive damages and an award of attorney fees in prosecuting this action.

## Request for Relief

Accordingly, Plaintiffs request that the Court grant the following relief:

1. Judgment in their favor against Defendants and an award of actual damages for Bryant's wanton and unnecessary physical and mental pain and suffering preceding her death, loss of enjoyment of life, medical and funeral expenses, her Estate's loss of her ability to labor and earn money, Winstead's and E.D.'s loss of consortium, love, support, and companionship of their mother, and punitive damages, for Defendants' unlawful actions;

2. An award of attorney fees, costs, and expenses incurred in prosecuting this action, pursuant to 42 U.S.C. § 1988;

3. Trial by jury; and

4. All other relief to which Plaintiffs may be entitled.

Respectfully submitted,


/s/ Aaron Bentley
Gregory A. Belzley
gbelzley@aol.com
Camille A. Bathurst
camillebathurst@aol.com
Aaron Bentley
abentley3B@gmail.com
Belzley, Bathurst & Bentley
P.O. Box 278
Prospect, Kentucky 40059
(502) 292-2452

David M. Schuler Jr.
Schuler Law Office
150 South Third Street
Louisville, Kentucky 40202
502-568-9000
502-568-9400 (fax)
dschuler@schuelrlawoffice.com
*Counsel for Plaintiffs*